## MASON, Receiver, etc., v. CLIFFORD.

(*Circuit Court, W. D. Wisconsin.* November 4, 1880.)

1. LEASE.—Neither the reservation of rent nor any particular form of words is essential to the creation of a lease.

2. CONTRACT—MASTER AND TENANT.—Contract construed, and *held*, under the circumstances of the case, not to create the relation of master and servant between the parties.

    *Fisk* v. *Farmington Manuf'g Co.* 14 Pick. 491, followed.

    *Whitney* v. *Clifford*, 46 Wis. 168, construing same contract, disapproved.

*S. U. Pinney* and *W. F. Vilas*, for plaintiff.

*Raymond & Haseltine*, for defendant.

BUNN, D. J. This action is brought to recover the value of a certain quantity of lumber destroyed by fire, charged to have originated from sparks proceeding from the defendant's shingle mill in a dry time and during a high wind. The case came on for trial at the June term, 1878, and was tried by a jury. The plaintiff, among other things, to sustain his action, which was grounded upon the defendant's negligence, introduced a written contract, of which the following is a copy:

"It is hereby agreed by and between A. F. Dodge, of the city of Stevens Point, in the county of Portage, and state of Wisconsin, and William J. Clifford, of the same place, that said Dodge shall work and operate, during the milling season of 1879, a certain shingle mill situate in the city of Stevens Point, which mill is now in the possession and under the control of said Clifford, and shall manufacture shingles from logs to be furnished by said Clifford as hereinafter stated.

"It is further agreed by and between said parties that said Clifford shall pay to said Dodge the following rates for manufacturing said shingles: for the brand known as Star A, 60 cents per thousand; and for the brand known as Shaded A, 42½ cents per thousand.

"It is further agreed by and between said parties that said shingles shall be made and put up in a good and workmanlike manner, and that said Dodge shall hire and pay all the men employed in the manufacture of said shingles, and shall provide all brands, band irons, oil, nails, and files in the manufacture of said shingles, and shall pay for repairing all breaks in the machinery of the said mill when the cost of said repairs shall not exceed five dollars; any break in the machinery of said mill, the repairing of which will cost more than five dollars, to be paid for by said Clifford.

"It is further agreed by and between said parties that said Dodge shall load all shingles so manufactured as aforesaid on the switch of said mill; said Clifford to pay all expenses for loading said shingles over and above the sum of $1.25 per

car, until such time as a new side-track to said mill shall be completed. After the completion of said side-track said loading to be done by the said Dodge, and included in said amount to be paid for manufacturing said shingles.

"It is further agreed by and between said parties that said Clifford shall remove, or cause to be removed, all slabs and refuse timber from the grounds of said mill, so that the amount of said slabs and refuse timber on the grounds of said mill shall not at any time exceed 10 cords.

"It is further agreed by and between said parties that said Clifford shall take an account of all shingles manufactured during each week at the end thereof, and shall credit said Dodge with the amount; and it is further agreed by and between said parties that said Clifford shall settle with said Dodge on the first day of each month, and shall at that time pay said Dodge the amount due for manufacturing said shingles at the price above stated.

"It is further agreed by and between said parties that said Clifford shall furnish to said Dodge good and suitable logs for shingles to be manufactured as aforesaid, said logs to be delivered in the mill boom by said Clifford, and that said Clifford shall keep said mill in good running order, and furnish logs as aforesaid in sufficient number to keep said mill running during the running season of 1877.

"It is further agreed by and between said parties that all shingles less than four inches, clear from knots in butt, may be packed and sold by said Dodge for his separate use and benefit, or said Clifford shall have the right to take said shingles, less than four inches clear, by paying said Dodge 25 cents per M. for manufacturing good shingles."

It appeared from the evidence that Dodge, at the time of the accident, was running the defendant's mill under this contract without any personal interference or control by the defendant; and the sole question is whether the effect of the contract is to give possession and control of the mill to Dodge, as lessee or otherwise, so as to make him liable and relieve the defendant; or whether Dodge is the agent or servant of Clifford, so as to render Clifford liable for Dodge's negligence.

When the plaintiff had rested his case defendant's counsel moved the court to direct a verdict for the defendant, and after argument a verdict was so directed, with leave to the plaintiff to have the question reviewed on a motion for a new trial before the full bench for misdirection to the jury.

The case turns on a pure question of law. There was no evidence tending to show personal negligence on the part of the defendant, and he is not liable unless the negligence of Dodge is imputed to him by reason of their relation of master and servant created by the contract.

Does the contract create that relation, or has it the effect to put the possession and control of the mill into the hands of Dodge during the running season? Some of the provisions of the contract are equivocal in their bearing, and are entirely consistent with either view. But the question can be fairly determined only by a comprehensive view of the various provisions taken together, and the effect to be given them as a whole. And we still think, after long and careful consideration of the contract, that the defendant is not liable. The question is not whether the contract is technically a lease of the premises, but whether the effect is to put the mill in the control of Dodge in his own right, and beyond the control and interference of Clifford. If such is the effect, and we think it is, then Dodge and not Clifford is liable for the negligence of Dodge and his workmen in running the mill. The rule that the tenant and not the landlord is liable for his own negligent acts in the use of the premises is not an arbitrary rule, but is founded upon deep and abiding principles of justice. The ground of the action in such cases is the personal negligence of the defendant. But if, without fault on his part, he has placed the use of the premises beyond his own personal control, in respect to the very matters whereof the complaint is made, then it is but simple justice that he should not be held liable.

It is true, there was no rent in terms reserved by the contract. Nevertheless, it is evident that Clifford gets his rent in the diminished cost of the shingles. Neither is the reservation of rent essential to a lease, nor any particular form

of words; but, as Bacon, in his Abridgment, says, "whatever words are sufficient to explain the intent of the parties, that the one shall divest himself of the possession and the other come into it for such a determinate time, such words, whether they run in the form of a license, covenant, or agreement, are themselves sufficient, and will, in construction of law, amount to a lease for years."

This instrument is in form an agreement. By its terms Dodge was to work and operate the mill during the milling season of 1877, which meant from April to November. The words, "which said mill is now in the possession and under the control of said Clifford," are merely descriptive of the property then in the hands of Clifford, and throw no light upon the intended relation of the parties after the contract was made. Dodge was to manfacture shingles at certain prices per thousand—60 cents for one brand, and $42\frac{1}{2}$ cents for another—from logs to be furnished by Clifford. Dodge was to hire and pay all the men, furnish all brands, band irons, oil, nails, and files, and pay for repairing all breaks in the machinery, the cost of which should not exceed five dollars, and Clifford for all that cost more than that sum. Clifford was to put the mill in good running order, and furnish good and suitable logs for shingles, in sufficient quantities to keep the mill running during the season. Dodge was to load all shingles on the cars, on the switch of the mill, Clifford to pay the expense over and above $1.25 per car until a new sidetrack should be completed, and after that the loading was to be wholly at Dodge's expense. These are the main provisions of the contract, and we think their effect is to give the possession and control to Dodge for the purposes therein indicated.

On one occasion the evidence shows they applied to Clifford to shut down his mill when the wind was blowing, and he referred them to Dodge, saying that Dodge had control of the mill, and that he (Clifford) had nothing to do with the running of it, and I think he was right. Dodge was, in his own way, and according to his own judgment and skill, and at his

own expense and for his benefit, to run and operate the mill for a determinate period, without interference or control from Clifford or any one, Clifford divesting himself of the control for the time being for the purposes indicated in the contract; and this is essentially what constitutes a lease, and is inconsistent with the relation of master and servant.

Apply any of the usual tests: Could Clifford, any time during the running season of 1877, turn Dodge out of the mill, or deprive him of the control of it? Or could he control Dodge in the running of the mill? Could he, under the contract, say to Dodge, "This mill must be run on such and such days, and during such and such hours, and not otherwise? If there is a dry time, or the wind is likely to come up, no fire shall be made and the mill must not run." Could he say who should be hired and who not, or how many hands should be employed, or what each should do, or regulate their time or wages, or judge of their competency? Could he discharge, or compel Dodge to discharge, an incompetent or careless hand employed in the management of the mill in those very respects wherein the negligence of a workman might cause damage to third persons? We believe he could not exercise such control, or do any of these things, under the contract; but that, on the contrary, Dodge was entitled to the possession and management of the mill during the life of the contract as against Clifford and all the world. But if he could not control Dodge in the running of the mill, Dodge was not his servant, and it is difficult to see on what principle of justice Clifford can be made liable for the personal negligence of those whom he has no authority to control. If Dodge had been a hired servant by the day or month, Clifford would have had full control of his actions and the men employed in the mill. He could then say how and when the mill should be run. In such case it would be but simple justice to impute the negligent acts of the servant done in the course of his employment to the master, and hold him liable for the consequences.

Again, suppose there were other expenses attending the

running of the mill, besides those expressly provided for in the contract, upon whom would the burden fall? I think upon Dodge, as the proprietor for the time being.

In *Fisk* v. *Farmington Manuf'g Co.* 14 Pick. 491, the defendants were owners of a cotton factory and mill power, and had purchased from the plaintiff the right of drawing off the water from his pond through his land below. The defendant had made a written contract with one Bird, by which Bird was to run the mill one year, and to manufacture for the defendants cotton shirtings, from cotton to be furnished by them, delivered at Boston, and for which the company agreed to pay Bird three and a half cents per yard for the cloth so manufactured by him at the end of each month. The cotton was to be used prudently and with care by Bird, and the mill kept in good running order by and at his expense, except the main gearing, which was to be repaired by the company if necessary; the waste to be accounted for by Bird, or delivered to the company. Bird, while running the mill, caused the water to be let off so rapidly as to overflow the plaintiff's meadow, and injure his hay and grass. The action for the damages so caused was brought against the company who owned the mill, and the court held that the effect of the contract was to give possession and control of the mill to Bird, and that the defendants were not liable.

This case is very nearly allied in its facts to the one at bar,—more nearly so than any other in the books,—and we think it an authority in point. We are aware that since the trial of this case the same question has been determined otherwise by the supreme court of Wisconsin. See *Whitney* v. *Clifford*, 46 Wis. 138. That case, depending on the same state of facts, was pending in the circuit court for Portage county at the time this case was tried and decided in this court. After the hearing here, the other case was brought on for trial in the state court and the same decision rendered at the circuit as was made in this court. An appeal was taken, and pending the motion for a new trial in this case the supreme court made a decision reversing that of the circuit court; and if it were a question of local law we should feel bound by

that decision.   But the case is one involving the proper construction of a written contract, which is a question at general law, upon which the parties have a right to the independent judgment of this court.   And after careful and earnest consideration of the opinion in that case, we are unable to concur in the conclusion arrived at.

The motion for a new trial is denied.